I'm here today on behalf of Crowley Marine Services. With me at council table is Vincent Larson, who is also on the brief. I'd like to reserve five minutes for rebuttal. All right. Watch your clock if you can. I'm sure the Court is aware this case arises out of a collision between the Tanker Allegiance owned by Appelli Maritrans and the Crowley Tug in the northern Puget Sound during the June 19, 2002. The parties tried the case to the district court in April 2004, and the court allocated 75 percent of the fault for the collision to Crowley and 25 percent to Maritrans. We believe that the allocation of fault is based on errors of law as well as the erroneous admission of certain evidence, and we would request that the Court reverse and remand the instructions. I'd like to begin with the certain issues, the basis for the allocation of fault to Crowley, and in particular, the Court's allocation of fault to Crowley because it concluded that Crowley was negligent in failing to monitor Captain McKeeferoff, the captain of the Tug Sea King, because of his off-duty use of alcohol and his medical history. How do you pronounce his name? McKeeferoff. It took me some time to figure that one out, too. Based on the evidence that the Court admitted, the Court concluded that Crowley should have known that Captain McKeeferoff was likely to suffer a debilitating episode while in command of the vessel. That conclusion, though, was reached on a complete absence of critical evidence. First, there was no evidence that the withdrawal of alcohol played any role in the collision. There was no evidence that Captain McKeeferoff had ever been declared not fit for duty and then not subsequently returned as fit for duty. Apparently, it was evidence that withdrawal from the alcohol had some effect, caused the most possible blackout, didn't it? That was an initial potential prognosis or a potential diagnosis reached by Dr. Pasnick at Island Hospital. But Dr. Pasnick was deposed. Her deposition testimony was put into the record and she concluded and she there refused to offer that as an opinion. So there was no medical opinion on the issue that that was caused by alcohol withdrawal. Where a medical care provider or a medical physician such as Dr. Pasnick won't and refuses to draw the conclusion that alcohol had any role in this, then we believe it would be beyond the capacity of a late-rider fact, including the Court, to reach the conclusion that alcohol played a role in that collision. Wasn't there a history of TIAs or mini-strokes in this Captain? There was one recorded TIA, transient ischemic attack, in May 12, 1999, that was known to Crowley. He was examined after that by physicians. He was declared temporarily not fit for duty. Later, I believe it was in June 1999, he was seen by physicians who declared him fit for duty without restrictions and concluded that the TIA had completely resolved. And there was nobody who ever offered the medical opinion that, in fact, he was not completely the TIA had not completely resolved. Nobody offered the opinion that he was that it was foreseeable to anyone that he would suffer another transient ischemic attack. And that's it. In your view, what is the obligation of the employer vis-à-vis the potentially problematic medical condition of a Captain? Are you asking me in general or are you asking me in general? Right. First, let's talk about what is the legal standard that we're looking at. What duty is imposed by law? There are some cases out there, the Armature case and the Impressus Linnaeus case cited by Meritrans. We've also recently identified an additional case that we haven't cited in the brief, but I could provide the citation by letter to the Court. And that case is Ellingsgaard v. Silver, which is a 223 Northeast 2nd, 813 case. We can provide that with a we have a little piece of paper that you can make a supplemental citation on and make sure you give it to your counsel. But since he doesn't have it and we don't have it, it's kind of hard to talk about it right now. Yes, that's right. In any case, we believe that the duty would be if there were evidence shown that Crowley knew or should have known that Captain McKeithroff was medically not fit for duty, then we believe, yes, if you had that and if you had something connecting that medical condition with this episode, whatever it was on the night in question, that then fault could be imposed on Crowley on that. In this case, though, there was no evidence that he was not medically fit for duty. Nobody offered the opinion that he was not. He only had an amnesia incident, though, in connection with this collision, didn't he? He had transient alteration in consciousness, as one doctor described it, or transient global amnesia. But that was, of course, that can, of course, be charged to Crowley's knowledge a few moments before the collision. Well, if declaring him unfit for duty is the only remedy the employer has, what about, for example, saying he should not be at the con by himself? Well, that would be an appropriate, that could potentially be an appropriate decision to make, and Crowley could potentially be held liable for not having made that decision if there were evidence in the record from which someone could have concluded that Crowley should have known that. But this would be a medical. I don't think that's the point. What you have here is a captain with a history of at least one TIA, maybe more, and you put him at the helm of this ship, which is important to what's going on here, and if he gets another one, maybe you don't want him there alone. And so what I'm saying is why isn't it reasonable to say the employer had other options? The employer, that would be reasonable if you say it's foreseeable that he would have another one. Hey, once you have a TIA, you're not immune from having another one. No one's, Your Honor, no one, you know, respectfully, no one is immune in the first place from having one. In this case, there was a physician who said that he was fit for duty and returned him without restrictions. The duty of all jobs. Now, who were these physicians that certified to that? Excuse me? Who were these physicians that certified to that? I gather they were people that just gave him a quick once-over and stamped his card present for duty, but did they really examine him very carefully? Well, he was examined by the physicians, and the physicians at the particular clinic used by Crowley at that time did declare him not fit for duty. On other occasions, he was also seen by his treating physicians, and the physicians at the particular clinic did declare him not fit for duty. Now, in this case, the physician of Meritrans, and apparently the conclusion of the district court was that these physicians in issuing fit-for-duty slips were, in fact, committing medical malpractice. What is the, you know, we have the judge here, I suppose, Judge Kunauer, who heard all the evidence. With respect to the medical question, what is your position as to what mistake he made, given his findings of fact, which are fairly detailed? Our position was that the, because there was all along a complete absence of proof as to the issue of causation, and there needs to be proof as to the issue of causation that the medical conditions in the record actually contributed to this. And that question of medical causation is one that requires expert testimony. It is not within the ken of a late-fire effect, not even the district court in this case. And with all due respect, Judge Kunauer, whether or not Captain McKeeferoff's transient alteration in consciousness was the result of any physical condition that was manifested in the record or made clear in the record before then, that question is a question requiring expert testimony. Ameritrans never offered any expert testimony on that issue. We did question, we did depose, Ameritrans deposed Drs. Pasnick and Salsbrotten, and both of them specifically declined to offer an opinion as to what caused that transient alteration in consciousness. If a medical professional can't and will not draw that conclusion, then we don't think that a late-fire effect, even the learned judge of the district court, can draw that conclusion. We, therefore, moved in Lemonet to exclude that evidence because of that fundamental absence of any evidence of a causal link. And we would request that the court reverse the district court in its decision to admit that evidence and remand this case and allocate fault without that evidence being taken into account. Paragard, we would also argue that the one of the critical issues here, this was the principal matter on which we think that fault was allocated to Crowley, and we can understand that. In the wake of the Exxon Valdez, in the wake of Captain Hazelwood, there has to be some sort of connection drawn. We believe that that evidence regarding alcohol use, although, again, simply no connection drawn ever between alcohol use and Captain McKeon. Well, is it a matter of record that he was a chronic alcoholic? It was a matter of record that he was a chronic alcoholic, but a chronic alcoholic isn't necessarily always drunk. And he was tested. Oh, I understand that, but, I mean, should he be in this kind of a position? That, you know, I think is perhaps where the district court went, was they felt like he shouldn't be in this position, but that wasn't the problem. There was no evidence that that was the problem that caused this collision. If he had been a chronic alcoholic. I guess I'm trying to put myself in the shoes of the trial court. You said the doctor, when she first saw him, thought that this alcoholism or withdrawal from alcohol could cause the blackout, but then later changed her opinion? She, that was not a, that was not an opinion. It was a possible diagnosis. Okay. And later a deposition asked specifically about that. She said, I do not have a diagnosis as to what happened. And the, he was tested, Captain McKeon was tested at the Island Hospital within a few hours of the collision. The results came back, absolutely no alcohol in his system. He had been on the vessel since a little before midnight on January 18th. He had been observed during that time. The crew members who observed him and who testified at trial said they saw no problems. There was never any suggestion at that time that he had any alcohol in his system. And the district court, in fact, concluded that there was no evidence that alcohol played any role in the collision. Nevertheless, having decided that, the district court nevertheless admitted that and held Crowley at fault for having kept him on the vessel with, with. Was there a requirement that he have someone else in the wheelhouse or wherever he was? Was that a requirement? There was no requirement that Crowley imposed on him to have, have somebody else in the wheelhouse at that time. The, there was a crew member, the chief engineer of the vessel, Mr. John Kramer, who was also on watch at that time and who was in the wheelhouse frequently during watch and had last been in there, I believe the testimony was, about 20 minutes before the collision. So there was no requirement. Now, the trial judges, I understand, found that the tug veered off in front of the, of the tanker before the collision. Is that a finding of fact? I know you don't agree with that, but I mean, you can't find that to be the fact. The district court concluded that, that something brought the tug, but didn't firmly conclude that. It said, it said basically, I don't really need to conclude that, although if I, if I had to conclude it, I would probably agree with the testing of Dr. Brown, the expert witness on that. I don't think that there was some kind of hydrodynamic impact. Something going on there in the water. And our, we have moved, we have moved to exclude Dr. Brown's testimony and we've requested that the court reverse the district court's denial on that. Dr. Brown's testing was based on putting the tug at about a third of the distance perhaps from the sideshell of the tanker that was testified to by the crew members of the allegiance. Doesn't that go to the weight, not the admissibility? No, because he didn't test, his, his testing didn't fit the facts of the case. And so it was simply, it didn't show us what would happen here. It just didn't match the facts of the case. In any event, we do feel that in, in one respect, this might not be critical because the, the rule is that when you have an overtaking vessel, and this is one point of our argument. When you have an overtaking vessel and it comes so near to the overtaken vessel that a sudden maneuver on the part of the overtaking vessel results in a collision, overtaken vessel results in a collision, then the fault is still allocated to the overtaking vessel. Let me ask you a question about that before your time runs out and you make, want to reserve some for rebuttal. We have these old cases. Do the old cases have the same immediate danger exclusion that the codified Kohlregs have? They do not seem to have that, the Rule 2B, or the Rule 2 special circumstances rule codified by the court under Kohlregs. Those cases that Joseph Ficarro, the Monterey, and the Paulsboro talk about vessels acting under a common, common plan, a common scheme. They don't talk about the special circumstances rules that set out in the Kohlregs which says that you can deviate from the rules only if it's necessary to do so to avoid an immediate danger. In this case. Do we have any cases since these were adopted that would give us any insight? We looked for them. Any circuit, anywhere? We looked for them. And some cases that we might cite to, and I can't remember whether these were cited in the briefing, although I believe that they were. The we did cite to the Alaska Packers case out of this district rules relating to special circumstances have been narrowly construed and will not be. Right. I should have been more specific. Do we have any circuit court cases? Circuit court cases. In the First National Bank of Chicago versus Material Service Company, seventh circuit case out of 1979, it states, the party seeking to justify departure bears the burden of proving it clearly necessitated by a sudden and alarming emergency. And we think that is fully consistent with the rule. There was no before the vessels got into such close proximity that the master, excuse me, the pilot of the Allegiance called. There was no necessity at that time requiring that it deviate, the Allegiance deviate from the coal rigs. We believe that it would be important to give tanker operators an incentive to adhere to the coal rigs. The safety principles of the coal rigs should be imposed on tanker operators. In this case, we narrowly avoided a collision in which the we could have had five fatalities, had these vessels met at a sharper angle. We might have had five fatalities and we might have had a laden oil tanker opened up in the northern Puget Sound with possible environmental consequences that we simply don't know what would have happened, but it's easy to imagine we would have had very severe environmental consequences. We feel that tanker operators should be given the message that they also need to adhere to the coal rigs. The rule adopted by the district court gives. And which specific rule are you saying the district court should not have applied, the overtaking rule? The district court held that there was no violation of the overtaking rule, and instead excused the Allegiance in large part on the grounds that the special circumstances rule permitted a deviation from the overtaking rule in this instance. And we think that the, again, that the overtaking rule is a clear rule. It applies on the face of the circumstances. And the special circumstances rule can be invoked only when there is a clear necessity to deviate from those rules. So we think that there was, given the undisputed fact that the tanker was approaching for more than 22 1⁄2 degrees above the beam of the Sea King at a speed two knots greater than that of the Sea King. So in your view, the tug captains and the tanker captain could not have arranged this escort plan because of the overtaking rule? It could have arranged, what the agreement was at this time was, take it back, it could have arranged something different. It could have arranged something. Could they have arranged this over this escort plan? Could they have arranged a specific escort plan? They could. They might have arranged. I think that's a yes. I'm trying to think back. And I'm trying to figure out what the specific escort plan is because I think it's this specific escort plan I'm having trouble with that because they arranged an escort plan. Right. And that was the tugs were supposed to go first. Right. They were supposed to go faster than the tanker. The tanker was to overtake and come up between them, and then the tugs were going to escort on in. Now, as you see the coal rigs, could that have been done legally? Yes, I do agree with that. That could have been done legally. The question is, was there a necessity in this case for them, or did they even agree that specifically that at that stage of the escort that the tanker would effectively take an interest? You know, maybe I read your brief wrong, but I thought you were saying that an agreement wouldn't be a special circumstance that could invoke the exception to the coal rigs. It would depend on where you are. I think a better circumstance is not out in the open waters of Puget Sound, but if you have an assist occurring down in Elliott Bay or, in this case, further up in Rosario Strait. Aren't you also saying there's got to be an immediate danger to depart from the coal rigs? That's the basic rule of the special circumstances rule. Right. So it seems to me that the – well, maybe I'm having some trouble with this, but I can see what an immediate danger is, but I can't understand how an agreement – you're now saying that there could be some agreement that would overtake the immediate – well, that would be an immediate danger, would invoke it? I mean, the whole thing is not making any sense to me, because basically, I guess, if you've got a boat here and you've got another one and the coal rigs don't apply, I guess you can say this one can hit that one, which makes no sense. All right. You know. The – there could be circumstances – we grant that there be circumstances in which you have vessels that are necessarily working in close proximity to one another where you can't figure out which of the coal rigs apply, and vessel assist circumstances. In this case, once you get the vessels up into the Rosario Strait, the chief has to come up to the stern of the – the chief was the other tug involved – has to come up to the stern of the tanker. The seeking was to be on port bow. At that case, we might not argue that there were a breach of some of the rules that could be involved at that time. We're saying here, under these circumstances, miles out from the rendezvous point that they were going to reach. So here's another one. You're supposed to not – you're supposed to take action to avoid a collision, right? That's it. If you've got a duty to avoid a collision, obviously, you're going to – you wouldn't get rid of all the coal rigs, and that would be a duty there. And, in fact, the Court concluded that there was a breach by Meritrans in failing to take earlier action to avoid this collision. Okay. Thank you. We've used up plenty of your time. We'll hear from Meritrans, please. Good morning. My name is Mark Warner. I'm representing the Pelley Meritrans Operating Company. I think it's important for the Court, first, to keep in mind that Judge Kruenhauer found a number of bases for fining 75 percent liability on the part of Crowley, most of which are not being appealed.  is not going to be able to appeal the case. Crowley's tug captain failed to exercise active navigation of his tugboat. In the brief, you've probably read that Crowley is making a point of that the tug captain maintained his tug on a steady heading by putting it on an autopilot. But the testimony, undisputed testimony, is that the autopilot of the tug only maintains the heading, the way that the bow is pointed. It does not adjust for current or wind. And also the undisputed testimony is that the tugboat, from the start of the escort until 45 minutes later when the collision occurred, had gradually drifted diagonally across the traffic lane toward the tanker and ultimately crossed the bow of the tanker. You're saying he got too close to the tanker by reason of that fact, right? That's right. That's right. The testimony is that there's a gradual drift from the separate – if the traffic lane is considered going this way, the tanker was approximately in the middle. The tugboat was here. They were both approximately pointed in the direction of the lay of the traffic lane. But because the tugboat was on autopilot and not adjusting for any of the external forces, even though it was pointed straight, it was slowly drifting this way toward the tanker. One question I had is it did seem he had a series of bases for finding the 75 percent. But if one of those or more were legally incorrect, would we have to send it back so we could figure out whether, for example, the automatic pilot heading and the tumultuous waves and stuff still was 75 percent? I don't believe you would, Your Honor. Not based on the numerous grounds the liability was found in this case. And I'll just quickly tick those off as well. In addition to the tug pilot. Let's talk about that one for a minute, though. In the context of your opponent's argument about the coal rigs, if the special circumstances doesn't apply – didn't apply and the tanker was an overtaking vessel, then the burden fell on the tanker essentially to do what was necessary to avoid the accident. The tanker did nothing here. And so your opponent is saying, well, that's it. Well, the answer to that, Your Honor, is that the trial judge didn't base or rely on the special circumstances rule to rule that the overtaking rule does not apply in this case. The judge looked at the three cases that were tried back in the early 20th century and realized that they specifically held that an overtaking rule does not apply in this circumstance. And he was also impressed, of course, with the fact that in the decades that the overtaking rule has existed and been applied, it has never been applied to vessels that are operating in concert for common goal under a pre-approved plan. Well, how about the collision rule, though? I mean, as Judge McEwen asked earlier, it seems to me that regardless of the circumstances, there's about to be a collision. And whoever's going to crash into the other vessel ought to try to slow down. I mean, there's common sense aside from the coal right. You're right, Your Honor. But judgment applies. Why didn't the tanker slow down? I mean, the judge said they didn't have time to slow down apparently. Well, there was a two-step process, Your Honor. I said it didn't blow the five blasts, which I guess is watch out. That's emergency or whatever. That's right. But he could have slowed down, it seems to me, when they got in this close proximity that just everybody slows down when there's a danger of an accident approaching. The thing is, Your Honor, in this case. I mean, there's a lot of common sense to this whole thing aside from the coal right. And I think they just codify the rules of the road that are applied to vessels generally, aren't they? I mean, there's nothing special about the coal right. Well, the coal rights were designed for vessels that are strangers to each other to give a set pattern or rules to deal with passing and meeting situations. But the situation in this case, Your Honor, was that the escort was going just as planned. As you've already recognized, the vessels had planned for the tugboats to take off ahead of time, for them to be split, for the tanker to be coming up slowly and passing between them. All that was going on as planned. In addition, Judge Brunauer found from the evidence that it was not unusual for tugboats in escort situations to range closer to and away from the escorted vessel. They're looking for places to put up lines in case of an emergency. They ultimately have to put up lines when they come into port. They hadn't even gotten close to where they were going to take the attached lines to the vessel, were they? No, but they had to. What was the point they were going to? I've forgotten. They would have tied up later on. You're right, Your Honor. But it's also common in the evidence show that tug vessels have to plan ahead of time where to put up lines because they're not only tasked with putting up lines when they come into port, but part of the reason they're escorting these vessels is to make sure that if there's an engine failure or a steering failure on the boat, they can put up lines quickly to bring the boat under control. So Judge Kuenhauer found that it was not unusual or alarming for the vessel to see the tugboat on its port side to be gradually drifting in. At a point, the pilot thought that it was getting outside of his comfort zone. That's when he radioed the tug pilot and said, Are you okay, Don? The tug pilot erroneously said, I am okay, even though it was established that he had just come out of some sort of a transient problem with his faculties. But the second part of this was that Dr. Brown's testimony showed that with the hydrodynamic forces going on at the bow of the tanker would have caused the tugboat at some point to quickly turn across the bow, and that, of course, confirmed the eyewitness testimony of the two people in the bridge of the tanker who said exactly that. They had seen the tug slowly, gradually diverging on the path of the tanker, which was not unusual in their opinion, but suddenly the tug took a swift turn to its starboard across the bow of the tanker. At that point, the tanker had no opportunity to slow down. These tankers take a mile or more to actually slow down, or there's also a delay in response to turning. So everything was going pretty much to plan until the tug took the sudden turn across the bow. But the judge said that they could have been more specific, I guess, in the radio transmission. That's right. And that's the whole basis of 25 percent. Right. That's correct. It seems you're both correct and incorrect about what Judge Kuhnhauer did, because I think it's hard to exactly figure out. At one point he says, well, really the only basis for liability for your client is the five toots and, you know, the other thing. But then he goes into the Kohlregs and says, well, either way you cut it, the overtaking rule doesn't apply, and you have these operating in concert, and then so therefore you can't really apply it. So it seems like on one hand he says, well, this is really the reason, but then he goes into this is the reason, you know, that the overtaking rule doesn't apply. So to me, I really had trouble pinpointing the precise basis for the opinion. It's a different violation, Your Honor, that he found that the vessel didn't sound or didn't give appropriate warning when it was – that wasn't under the overtaking rule. That was a different rule. But that's what I'm saying. First he says that's really his basis for figuring out what your client's liability is. But then he goes on to discuss really because there is no overtaking rule. So it seems like another reason that he limited your client's liability is because in his view the overtaking rule didn't apply in this circumstance. That's correct, Your Honor. He found that. So if he were wrong about that, then wouldn't we have to ask him, does he still think you're only 25 percent liable? I personally feel that there's enough grounds otherwise that he found a liability on Crowley's part that that wouldn't be necessary. He also found that Crowley had violated the lookout rule, that they didn't have one person who was getting. I mean, there's no doubt they might have – they had a lot of things wrong. That's right. On the side of the ledger. The only question is how do you divide them up. That's right. And beyond that, the judge found that because of this disabling episode that the tug captain was having, that caused the tugboat to be unreasonably unsafe, in other words, unseaworthy in maritime terms, and that that was the cause of the accident itself. So there's a lot of grounds there. But the overtaking rule is just common sense, too. The vessel that's behind, if they're approaching an accident, if he slows down, all he has to do is slow down to avoid the accident. And secondly, he's looking at the boat in front of him, and the boat in front of him is not looking back at him. So that's the common sense of the taking rule. But, Your Honor, talking in common sense here, though – You don't have to abandon common sense just because you – No, not at all. – have these colorings. In this situation, Your Honor, it makes common sense for the overtaking rule not to apply, because both tug captains specifically testified that they felt that their They said that their responsibility was to stay out of the way of the oil tanker. They testified that they were going to leave plenty of room on either side of the traffic lane for the tanker to have that middle area to traverse. And they also specifically said that they expected to adjust their course and their speed and their heading to that of the tanker. So if the overtaking rule was applied in this situation under those facts, it would be totally contrary to the expectations of what the three participants had that night. The overtaking rule would require that the tugboats not move at all, that they just maintain whatever heading that they were on, and only the tanker navigate, as opposed to their testimony that they expected to adjust to the tanker, and that the tanker was their only concern, and they were going to leave the tanker all the room that there was. If that's your expectation, and if the duty to avoid collision were on the table, under your theory, just because there was this agreement that the tugs were to operate in a certain way, if you find out they're not, are you supposed to just go sort of full steam ahead and run into them? No, that's why the pilot radioed the tug, asked if everything was okay. He knew the tug pilot from other missions. He was told everything is okay. Again, tugboats coming in and out close to tankers or nests, of course, is not unusual. That was the undisputed testimony. And when the emergency actually occurred with a sudden turn, the tank testing done by Dr. Brown showed that that would happen very suddenly, and that is exactly what the two witnesses on the bridge of the tanker said, that there was no time to react when the tug suddenly veered across the bow. The tug was going at a higher speed than the, or a slower speed rather than the tanker. If they were close together at this point, by the time they got to the end of the run, the tanker would have been way ahead of the tug, wouldn't it? Well, this particular tug that ran across the bow, the tanker was going to be taking up a position further back along the tanker, and the tanker would, as it reached the rendezvous point, be decreasing its speed. Moving ahead of it. Yeah. Let's talk about the captain's situation. And I'll just tell you kind of what troubles me. Well, I haven't figured out what this means legally. It just seems if you have somebody who has some disease, but you haven't linked that up with the accident, and you don't have evidence, you know, of causation, how do you figure out what the employer's kind of downstream foreseeability and liability is? So, for example, you could have somebody who's way overweight and had a heart attack, and we all know that maybe that means you're more likely to have another one. But if he gets a doctor's pass, what's the employer to do? Well, Your Honor, first of all, there was a clear causal connection between Captain Nikiforov's prior mini strokes. He had clogged blood vessels going up to his brain. He had numerous references in his medical records that were in Crowley's file of his alcoholism, his abuse of alcohol, and his problems with withdrawal from alcohol. Right. But then we have a doctor that says there's not a problem, and we don't have somebody who says those problems were the cause here. Well, first of all, Dr. Pasnick was one of the doctors who examined him within a day after the accident. It's true that at her deposition she said that I don't – she refused to give a technical diagnosis of what caused this blackout or period that Captain Nikiforov had. But she did state clearly that the two most likely causes of this state that he experienced was either a mini stroke or alcohol withdrawal. And those, of course, were the two of the specific problems, existing problems, that Crowley knew of either from talking with Captain Nikiforov or from the notations in the medical records that Crowley maintained on Captain Nikiforov. Okay. Well, let's take out – let's divide them in half. Let's take the mini stroke. If you had somebody who had a stroke, and then the doctor says, but you're fine to go to work, then he goes to work, and a couple years later, three years later, he has another stroke. And the doctor says, well, obviously I think his stroke is what caused him to have the – we'll call it a blackout. I don't know exactly what it was, but the consciousness issue. Would the employer be liable for having him on the ship? In this case, Your Honor, yes, because despite having the records and the knowledge that Captain Nikiforov had all these problems. You know, I'm asking about my hypothetical. If all you have is somebody that had a stroke, and then they go through life, and they have another stroke, and the doctor says, well, it's that second stroke that caused the blackout, which caused the accident, would the employer be liable in that case? Given those facts, I believe they would, Your Honor. Are you asking me this? I mean, so in other words, once you have a stroke or a heart attack or something, basically the employer is on notice that they're going to be liable. If you ever have another one again, that it's their fault. They're on notice, Your Honor, I think, to take extra care in continually asking the person how they're doing, to require more frequent physicals. When was his last physical before the accident in this case? He had a Coast Guard physical in 2000, two years before the accident. In that physical, he was asked to attest to whether he had any significant medical history, to which he replied no. Now, that was after he had had his first mini-stroke, after he had been diagnosed as an alcoholic with binge drinking. And Crowley had that record in their file on Captain McKeithroff. So they not only knew that he had problems, one of which the mini-stroke had happened while he was on duty, but they also knew that he was not being totally honest with reporting his symptoms to whoever was questioning him when his ability to sail was at stake. And in addition, I should point out that none of the fit-for-duty slips that Crowley is relying on mentioned at all alcohol. Crowley knew that they had an alcoholic employee who was continuing to drink and binge drinking. There was no fit-for-duty slip that they could rely on to give them some comfort that his alcohol problem was not going to affect his ability. So in other words, you're saying there was enough there that they couldn't just pass him over. They either take special precautions or put another guy on the bridge or whatever the case may be. That's right, Your Honor. And that kind of goes along with the Holy and the Impressive case, which is a Fourth Circuit case. I mistakenly cited that as out of this circuit. I'm sorry. But where it was held that even though the individual had gone to doctors and complained of problems and the doctors had not found him unfit for duty, that the employer, in this case the United States government, had an obligation to look beyond that. They knew that he had been going continuously. They knew he had been complaining of problems. And yet they didn't do anything extra other than looking at the form that was filled out saying fit-for-duty or unfit-for-duty. And that's the evidence here. Crowley didn't do anything. They treated this man after knowledge of his alcoholism, after their knowledge of his past problems with the mini-stroke and the blood vessels, as any other captain without any medical problems. They never asked him about his off-duty time, whether he was having problems. And that is the negligence that Judge Kuhnhauer found under these circumstances. There was just too much for them to have turned a blind eye. And as counsel mentioned, after Exxon Valdez, with the blind eye that Exxon turned toward Captain Hazelwood's history, after what appears to be the blind eye that the New York ferry system turned to the assistant captain who crashed the ferry in March of October of 2003 into the dock in New York City, it's amazing that a vessel owner today will still argue that they have limited duty to look into known physical problems that one of their customers has. So I mean, the captain of the Valdez was under the influence when he was at the helm, wasn't he? He was not at the helm. He had given the helm to an underling who had no experience, but he had a drinking problem and there was evidence that he had been drinking before they left, and that's why he turned the helm over to someone who was at least sober but unfortunately didn't know the waters. I see I'm almost out of time. I don't know if you have any questions on the admissibility of Dr. Brown's testimony. Dr. Brown is a recognized naval architect with a great deal of experience in testing models in tank situations, given model speed, to see what the hydrodynamic forces were. Our brief clearly points out the similarities in the scenarios that Dr. Brown tested that were very similar to the facts of this case. And he confirmed that the eyewitness accounts that as the tugboat approached the bow of the tanker, there were hydrodynamic forces that would have swiftly turned the tug across the bow of the tanker. As you've recognized, at the very most, this was an issue of the weight of the evidence that should be assigned to Dr. Brown's testimony and not an exclusion of it. Of course, the trial judge had a great deal of discretion in deciding what type of expert testimony is admissible. Thank you, Mr. Wernick. Thank you. You've used up way more than your time, but I'm going to give you another minute because you're the last case on the calendar and everyone wants rebuttal. Thank you, Your Honor. I think it's interesting, again, that counsel here pressed very hard on the issue of alcohol and alcoholism, when, again, there's no evidence that alcoholism played any role in this. And the argument seems to be we should have fired him because he was an alcoholic, even though the alcohol didn't play a role. We think there's no question the alcohol, there's no evidence that alcohol played a role here. The Court concluded there was no evidence that alcohol played a role here, but it was admitted nevertheless. We feel that that was obviously erroneous and the Court was affected. Even though it was a bench trial, the Court was affected by that erroneous admission of alcoholism, of alcoholism. And I think we'll end with that.  I think the point of the case is that, in regard to the Mr. Warner argues, in essence, that there were assumptions about what the vessels were doing. The Kohlreggs tell you and the cases tell you you can't rely on assumptions about what the vessel is going to do. Kohlreggs assumes that you have a black box in the other vessel and you should treat it that way.  Thank you. I thank both counsel for their argument. The case of Crowley v. Maritrans is submitted and we'll adjourn for this morning.
judges: Cudahy , T.G. Nelson, McKeown